**Jeanne L. HICKS, Appellant (Intervening Defendant, Counterclaimant and Cross-Claimant below),**

**v.**

**Miriam Callahan FIELMAN, Appellee (Plaintiff below).**

**Associates In Anesthesiology, Inc., Associates In Anesthesiology, Inc., Trustees, Louis D. Bojrab, M.D., Michael L. Yacko, M.D., Jon P. Jontz, M.D., Associates In Anesthesiology, Inc., Committee For Profit Sharing Plan, Louis D. Bojrab, M.D., Alexander F. Craig, M.D., and Robert E. Vore, M.D., Appellees (Defendants below).**

**No. 2-579A160.**

Court of Appeals of Indiana, Second District.

June 15, 1981.

Steven G. Cracraft, Kothe, Shotwell, Claycombe, Hendrickson & Kortepeter, Indianapolis, for appellant.

Eugene H. Yockey and Terrence P. Pehler, Kammins, LeMond, Carson, Yockey & Pehler, Indianapolis, for appellee, Miriam Callahan Fielman.

J. Maurice Harrell, Holwager & Harrell, Beech Grove, for appellees, Associates in Anesthesiology, Inc.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Jeanne L. Hicks (Jeanne) appeals from a summary judgment against her in her intervention as a defendant in a suit between Miriam Callahan Fielman (Fielman) and Associates in Anesthesiology (Associates), in which she sought to have her former husband's death benefits under the Associates' profit-sharing plan included in his probate estate in satisfaction of an "alimony" judgment.

We affirm.

## FACTS

On April 18, 1977, Dr. Murwyn L. Hicks (Murwyn) and Jeanne L. Hicks were divorced. Only one portion of the decree is material to this cause:

2. That the Agreement concerning the maintenance and custody of the parties' minor child, division of property rights and payment of attorney fees entered into between the petitioner and respondent is approved by the Court and made a part of this decree, the same as if the terms and provisions thereof were fully recited herein, and each of the parties is ordered and directed by the Court to carry out the terms and provisions of said Agreement.

3. That the wife be and she is hereby awarded an alimony judgment against the husband in the amount of SEVENTY TWO THOUSAND SIX HUNDRED DOLLARS ($72,600.00) payable under the terms of the Property Settlement Agreement enter [sic] in evidence this [sic] action and approved by this Court.

The decree referred to Paragraph 10 of Part II of the property settlement agreement, which said:

10. Respondent [Jeanne] shall have and recover from petitioner [Murwyn] an alimony judgment in the sum of Seventy-Two Thousand Six Hundred Dollars ($72,-600.00) payable at the rate of Six Hundred Dollars ($600.00) per month commencing May 1, 1977, except that in the event petitioner retires from the practice of medicine at age 62 years, the monthly payments shall be reduced to Four Hundred Dollars ($400.00) per month effective the first month following such retirement. In any event, *all payments provided for in this paragraph 10 shall cease upon the demise or remarriage of respondent.* (emphasis added.)

Eleven other paragraphs in the agreement specifically allocated the Hickses' property between them, including their bank accounts. Paragraph eight of the agreement provided that

[Murwyn] shall retain as his sole property all of his right, title and interest in and to the Pension Trust and Profit Sharing Trust through Associates in Anesthesiology, Inc.

Finally, the Hickses agreed "that this Agreement embodies a disposition of *all the property* acquired by the parties prior to

and during their marriage up to the date of their separation." (Emphasis added.)

Dr. Hicks was an employee of Associates in Anesthesiology, Inc., and was one of the trustees of the profit-sharing plan set up by the corporation. On September 8, 1977, Murwyn named Miriam Callahan Fielman his primary death beneficiary under the profit-sharing plan. Mrs. Fielman was listed by Murwyn as his wife, though it appears that the two had never married. At all times, Murwyn complied with the maintenance order, until he died on October 23, 1977.

On January 25, 1978, Mrs. Fielman sued Associates in Anesthesiology, and the three doctors who constituted the Associates' profit-sharing plan committee, and who were the trustees for the plan. The complaint alleged that as death beneficiary, Fielman was entitled to some $91,000 out of the plan and had not been paid.

On March 22, Jeanne filed her motion to intervene as a party-defendant, which was granted on the 23rd. She filed a cross-complaint, the gist of which was that Murwyn had made no payments toward child support or alimony after his death, as a result of which the child support was in a small but increasing arrearage, and the remainder of the $72,600 alimony figure ought to become due and payable.

Jeanne had made the identical claim in the Marion Probate Court, in her January 31, 1978 "Petition for Contempt for Non-Payment of Alimony Judgment and Child Support and for Garnishment of Trust Assets for the Payment of Alimony Judgment and Child Support," filed against Murwyn's estate. That petition was transferred to the Superior Court, Room 7, and consolidated with the instant case. Murwyn's probate estate is insufficient to cover her claims.

The record does not clearly show whether the separation agreement, including the alimony provision, attempted to dispose of more property than the Hickses owned at the time of the divorce.

During the pendency of this suit before the trial court, Miriam Callahan Fielman died. Her executor, Frank F. Fielman, Sr., to whom she had been married, was substituted as plaintiff on May 19.

Fielman had moved for summary judgment as early as March 17. A hearing on the motion was held on May 26, and summary judgment was granted on July 3. In partial satisfaction of Jeanne's motion to correct errors, the motion for summary judgment was reheard on December 14. In its final judgment entered March 1, 1979, the trial court found "that there is no genuine issue as to any material fact and the Motion for Summary Judgment of the Plaintiff [Fielman] is sustained and Judgment entered of record herein." The remainder of the motion to correct errors was denied.

## ISSUE AND SUMMARY OF ARGUMENT

Is a recipient of maintenance a creditor of her former spouse's estate?

■ Jeanne claims Murwyn's death benefits as Murwyn's creditor in the amount of $72,600.00, of which only $3,600.00 had been paid. She argues that the naming of a death beneficiary in a profit-sharing plan amounts to the exercise of a general testamentary power of appointment. In her view, the naming of Fielman as the death beneficiary was an exercise of that power in favor of a stranger in defraud of Jeanne as a creditor; and Jeanne cites authority for the proposition that in such a case, Equity will require that the money so appointed will go to the creditor and not to the stranger.

Regardless of the vitality of the rule she argues, and regardless of whether we should consider Murwyn's naming a death beneficiary a fraud upon his creditors, it is essential to Jeanne's argument that in fact she be a creditor of Murwyn's estate. If she is not, then her other arguments are immaterial, for they are premised on her being a creditor. Because we conclude she is *not* a creditor, we do not need to consider whether the death benefits should be swept into Murwyn's estate for Jeanne's benefit.

## DECISION

CONCLUSION—Jeanne is not a creditor of Murwyn's estate and therefore she may not reach the trust assets.

■ Paragraph 10 of the Hickses' separation agreement did not call for a cash property settlement (once known as alimony in gross), but provided instead for maintenance (periodic alimony). Unless an agreement or decree calling for maintenance clearly says otherwise, maintenance payments can not accrue after the death of the person liable for them.

## DISCUSSION

Crucial to Jeanne's status is Section 10 of the Dissolution of Marriage Act of 1973 which provides that "the parties may agree in writing to provisions for the maintenance of either of them . . . ." AIC § 31–1–11.5–10(a) (West 1979): [1]

Sec. 10. Agreements. (a) To promote the amicable settlements of disputes that have arisen or may arise between the parties to a marriage attendant upon the dissolution of their marriage, *the parties may agree in writing to provisions for the maintenance of either of them*, the disposition of any property owned by either or both of them and the custody and support of their children.

(b) In an action for dissolution of the marriage the terms of the agreement if approved by the court shall be incorporated and merged into the decree and the parties ordered to perform them, or the court may make provisions for disposition of property, child support, maintenance, and custody as provided in this chapter.

(c) The disposition of property settled by such an agreement and incorporated and merged into the decree shall not be subject to subsequent modification by the court except as the agreement itself may prescribe or the parties may subsequently consent.

AIC § 31–1–11.5–10 (West 1979) (Emphasis added.)

It is apparent from the statute that parties may, if they wish, make an agreement as the Hickses have done, requiring the payment of "alimony"; and once this agreement is approved by the court, both parties will be bound by their agreement.

■ The legislative scheme for awarding maintenance strongly suggests that the purpose of maintenance is to continue the support of a spouse past the dissolution of the marriage. First, while maintenance is generally left to the mutual consent of the parties, IC 31–1–11.5–10(a), the courts are empowered to *order* it when a spouse is incapacitated, and thus would otherwise have no means of support. IC 31–1–11.5–9(c); *Liszkai v. Liszkai* (1976), 168 Ind.App. 532, 343 N.E.2d 799.

■ Second, the Dissolution Act requires that *all* of the marital property be divided between the spouses in one final settlement. IC 31–1–11.5–11(b); *In Re Marriage of Dreflak* (1979), Ind.App., 393 N.E.2d 773 (courts may not omit portions of the marital estate); *Savage v. Savage* (1978), Ind.App., 374 N.E.2d 536 (distributions may not exceed the marital estate); *Wilhelm v. Wilhelm* (1979), Ind.App., 397 N.E.2d 1079 (the finality of the property division may not be impaired by making portions of it conditional). Cash payments, possibly in installments, may be made in aid of the property division under § 11(b) of the Dissolution Act. This provision for cash payments in aid of property divisions is the *only* mechanism provided to transfer money

---

1. Not applicable here is Sec. 9(c) which allows the court to make provision for physical or mental incapacity:

(c) The court may make no provision for maintenance except that when the court finds a spouse to be physically or mentally incapacitated to the extent that the ability of such incapacitated spouse to support himself or herself is materially affected, the court may make provision for the maintenance of said spouse during any such incapacity, subject to further order of this court.
AIC 31–1–11.5–9 (West 1979).

between spouses for purposes other than support.[2]

■ It follows that maintenance, the only other mechanism for transferring money, has *no purpose other than the support of the receiving spouse.* The legislature's reasons for permitting couples to agree to maintenance are evident. First, if maintenance agreements are possible, it would be easier for many couples to dissolve the marital relationship in a mutually acceptable fashion, rather than obtaining their peace by judicial order.

■ The influence of the Internal Revenue Code is equally important. The problem of dividing a marital estate is often one of tax management. Section 71(a)(1) of the Code, 26 U.S.C. § 71(a)(1), provides that money paid by one spouse for the support of the other is to be treated as income to the recipient; and those payments are claimable as a deduction by the payor. 26 U.S.C. § 215. Couples often plan to make use of these provisions, and we read § 10(a) of the Dissolution Act as being the only means of permitting them to do so. Otherwise, under our statutory scheme of division of property divorcing citizens of the State of Indiana would have the singular distinction of being unable to avail themselves of maintenance agreements to bring themselves within these provisions of the Internal Revenue Code. Our legislature could not have intended such an absurd result. Consequently our interpretation of § 10(a) is that the word "maintenance" includes the concept of support as that term is used in federal income tax law.

As we see it, the Legislature, in enacting § 10 of the Dissolution Act, was merely putting a new hinge on an old door. It was possible prior to 1973 to qualify alimony payments under section 71(a)(1) of the IRC; by enacting § 10(a), the Legislature made it possible to continue doing so.

Jeanne's assertion that her alimony judgment makes her a creditor of Murwyn's

estate rests upon *White v. White* (1975), 167 Ind.App. 459, 338 N.E.2d 749. The decree in that case called for an immediate payment of $34,000 cash. followed by $66,000 payable in eleven annual installments of $6,000. The husband died after the third installment payment, and the wife filed a claim against his estate for the remaining $48,000. The estate appealed judgment for the wife, arguing that the unpaid balance did not present a valid claim against the estate.

■ The court interpreted the pre-1973 statute as providing for both alimony in gross (a sum certain, payable in one or more installments, generally for property division purposes) and periodic alimony (payments made for purposes of support, subject to modification or termination either by court order or upon some condition). It acknowledged that the obligation to pay periodic alimony ceases with the death of the person liable for the payments. 167 Ind.App. at 471, 338 N.E.2d at 756. But an award of alimony in gross makes the party in whose favor the judgment was made the other's creditor, and she may recover against her former spouse's estate. *Id.*

■ Jeanne reasons that Paragraph 10 of the separation agreement provided for alimony in gross—a property settlement— in the amount of $72,600. But this is not so. Paragraph 10 would describe alimony in gross had it made the payment of the $72,600 unconditional. Instead, "all payments ... shall cease upon the demise or remarriage of [Jeanne]." The imposition of conditions subsequent has made the amount to be paid uncertain, indeed unascertainable. *See Wilhelm, supra.* Paragraph 10 in effect required that Murwyn pay Jeanne $600 per month maintenance, subject to reduction should he retire at age 62, which payments are to cease upon the happening of one of three contingencies: Jeanne's death; Jeanne's remarriage; or the payments' reaching the sum of $72,600.

2. The legislature has set out a minor exception for couples with very little property. IC 31–1–11.5–11(c).

Finally, an inspection of the separation agreement as a whole shows that the "alimony" provision was intended to provide for maintenance payments for Jeanne. The remainder of the agreement appears to dispose of the whole of the marital property, *including the Hickses' cash* in their bank accounts. The payments were to end when Jeanne died or remarried, at which time she would be presumed to have no further need of financial support. The payments were to be reduced upon Murwyn's retirement, when he would be presumed not to have as much income with which to support Jeanne as when he was in practice. If the alimony agreement was intended to divide the Hickses' property between them, it would make no sense to condition the payments upon Jeanne's need for income, and Murwyn's ability to earn income. *Id.*

That Murwyn's estate, a scant six months after the divorce, could not satisfy Jeanne's claims is further suggestive that the alimony agreement was not intended to distribute the Hickses' marital property, but to turn over a portion of Murwyn's future income as maintenance. *See Wilcox v. Wilcox* (1977), Ind.App., 365 N.E.2d 792.

Thus, Jeanne seeks to recover not on a judgment for a cash property settlement, or for alimony in gross, but on a judgment for her support by means of periodic alimony: maintenance. It is implicit in the decision in *White, supra,* that the obligation to pay periodic alimony ceases with the death of the person liable for it. This seems to be the general rule when the decree allowing alimony does not provide that payments shall continue after the death of the payor. See 40 Notre Dame Law. 472 (1965); 24 Am.Jur.2d *Divorce and Separation,* § 642 (1966), and cases cited therein. The same result was reached by our supreme court in the related area of child support. *McKamey v. Watkins* (1971), 257 Ind. 195, 273 N.E.2d 542.

We therefore conclude that Jeanne's claim was for maintenance after the death of her former husband and could not as a matter of law succeed. This conclusion alone supports the trial court's grant of summary judgment against her.

The judgment is affirmed.

STATON, J. (sitting by designation), concurs.

SULLIVAN, J., concurs in result and files a separate opinion.

SULLIVAN, Judge, concurring in result.

I respectfully disagree with the majority's analysis of the issues. Determining that Jeanne Hicks is not a creditor of Murwyn Hicks's estate, i. e., that her claim was for maintenance, requires a close examination of the property distributed through the dissolution decree, in relation to the amount of property actually available for distribution. As the majority concedes (at 719) the record here is unclear as to whether the decree disposed of more property than was owned by the Hickses at the time of the dissolution. There is, in fact, nothing else in the record to justify the majority's conclusion that Jeanne and Murwyn intended the "alimony judgment" to represent an award of maintenance, rather than the prolonged distribution of existing marital property.[1] The "alimony judgment" paragraph is located in the "Provisions Affecting Division of Property" section of the agreement executed by the parties. Additionally, paragraph 12 of this section expresses the parties' intention that the agreement dispose of "all property acquired by the parties prior to and during their marriage . . . ." Finally, the term "maintenance" as used in the dissolution decree clearly refers to child support. Absent a definitive record on the amount of marital property owned at the time of dissolution, the evidence supports one conclusion as well as another and the majority's holding seems speculative.

---

1. *I agree, however, with the majority's general analysis of I.C. 31–1–11.5–10(a), concerning the ability of parties to agree "in writing to provi-* sions for the maintenance of either of them . . . ." At 720–721.

Jeanne's only claim to the profit-sharing trust is as a general creditor of Murwyn's estate. Any specific interest she could have had as a result of the dissolution was relinquished in the property settlement agreement incorporated into the dissolution decree. The dispositive issue, then, is whether the profit-sharing plan benefits are assets of Murwyn's probate estate.[2]

The profit-sharing plan established by Associates in Anesthesiology for its employees provides for three types of benefits: retirement benefits, termination and disability benefits, and death benefits. In addition, employees have an annual option to accept a portion of the amount credited to their account as "additional compensation." Payment of all benefits is, of course, governed by the terms of the profit-sharing plan and the trust indenture executed incident thereto.

Death benefits are paid only if an employee dies before retirement or the termination of his employment. Payment is made "in a lump sum to the primary or contingent beneficiary designated by the deceased [employee]." The plan further provides that if the primary and contingent beneficiaries predecease the employee, the death benefits are paid to the employee's estate.

It is uncontested that Murwyn timely designated his primary beneficiary. This beneficiary, Mrs. Fielman, was living when Murwyn died. By the express terms of the plan the death benefits passed directly to Mrs. Fielman rather than Murwyn's probate estate. The benefits were therefore never available to Jeanne as a general creditor of the estate.[3] *See In re Lauro's Estate* (Pa.1961), 79 Montg. County L.Rep. 51, 27 Pa.D. & C.2d 579; *Cf.* I.C. 27–1–12–29 (Burns Code Ed.1975) (group life insurance proceeds); I.C. 27–1–14–16 (Burns Code Ed. 1975) (fraternal beneficiary association benefits); I.C. 27–8–3–23 (Burns Code Ed.1975) (Mutual life and accident insurance benefits). For this reason I concur in the result reached by the majority.

---

2. It is essential to distinguish between the probate estate and the taxable estate. The latter is much more inclusive due to the scope of federal and state statutes governing the transfer of property by a decedent. *See* 26 U.S.C.A. § 2001 *et seq.* (West 1979 & Supp.1981); I.C. 6–4.1–1–1 *et seq.* (Burns Code Ed.1978 & Supp. 1980).. We are only concerned here with the probate estate.

3. I also note that Jeanne failed to provide a record to substantiate her claim of fraud. The record merely shows that Murwyn named Mrs. Fielman as the death beneficiary after Jeanne relinquished all rights to the profit-sharing plan. As noted above, the death benefits vested in Mrs. Fielman immediately upon Murwyn's death pursuant to the terms of the plan.