**Ronald VOIGT, Appellant (Petitioner Below),**

v.

**Sharon J. VOIGT, Appellee (Respondent Below).**

No. 79S02–9505–CV–501.

Supreme Court of Indiana.

Aug. 5, 1996.

John H. Meyers, Lafayette, for Appellant.

Carolyn S. Holder, Lafayette, for Appellant.

SHEPARD, Chief Justice.

Ronald Voigt appealed the trial court's dismissal of his petition to modify the spousal maintenance provisions of a settlement agreement he entered with his former wife, Sharon, upon the dissolution of their marriage. The Court of Appeals reversed the dismissal. We granted transfer and now affirm the judgment of the trial court.

## I. Background

Married since 1964, Ronald and Sharon Voigt separated in 1989. Two years later, Ronald filed a dissolution action. Sharon countersued, seeking, among other things, spousal maintenance.

The parties negotiated a comprehensive settlement agreement. It was a six-page, notarized document that contained twenty-two provisions to which the parties consented "in consideration of" the document's "promises and mutual covenants." (R. 33.) The agreement addressed matters of child custody and support, property disposition, and spousal maintenance.[1] In paragraph 10, Ronald agreed to pay Sharon, "as maintenance, the sum of $400.00 per week," until she died, remarried, or reached age 65. (R. 35.) "In consideration of *all* the promises" in the agreement, they released any other marital claims against each other. (R. 35–36 (emphasis added).) Finally, paragraph 20 provided that "[a] modification ... of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement." (R. 37.)

---

1. The agreement recommended that Sharon take custody of the Voigt's eighteen-year-old son, while Ronald agreed to pay the college costs, including health care expenses, for both the Voigt's children. In addition, Sharon was to receive a house in Lafayette and assume its mortgage liability. She also received two cars, a payment and reimbursement totaling $11,100, and $400 per week in spousal maintenance. She would remain the beneficiary of Ronald's existing life insurance, which he would maintain. Sharon assumed full responsibility for her student loans, but Ronald agreed to pay her health care costs until she obtained a Ph.D. Two other properties were to be sold with the proceeds divided equally, although Sharon was to receive rent from them and assume their mortgage liabilities in the interim. Designated stocks and retirement funds were also to be divided equally. Lastly, the parties became sole owners of the personal property then in their respective possession. (R. 33–38.)

Ronald and Sharon waived a final hearing under § 8(d) of the Dissolution of Marriage Act, Ind.Code Ann. § 31–1–11.5–8(d) (West Supp.1995), and Judge Melichar of the Tippecanoe Circuit Court entered a dissolution decree on July 20, 1992. Finding that the settlement agreement "was entered into fairly, without fraud, duress or undue influence," he incorporated it into the decree and ordered Ronald and Sharon to carry out its provisions. (R. 32.) *See* Ind.Code Ann. § 31–1–11.5–10(b) (West 1979) (providing that court must incorporate terms of approved settlement agreement into dissolution decree and order parties to perform them).

Within a month, Ronald simply stopped paying the spousal maintenance. By early 1993, he owed $10,800 in accumulated payments. Sharon sought unsuccessfully to have him held in contempt but managed to secure a lien on his portion of the proceeds from the anticipated sale of one of the couple's properties.

A few months later, Ronald petitioned for a modification of the maintenance provision citing an alleged "material change" in his "financial circumstances" which made it "impossible and unreasonable" for him to make the promised payments. (R. 58.)[2] Sharon filed a motion to dismiss,[3] which the trial court granted, (R. 96).

At issue was whether paragraph 20's express modification procedure, which required the consent of both Ronald and Sharon, prevented the trial court from unilaterally modifying Ronald's maintenance obligation. This question involved the application of two conflicting Court of Appeals precedents, *Pfenninger v. Pfenninger*, 463 N.E.2d 1115 (Ind. Ct.App.1984), and *Bowman v. Bowman*, 567 N.E.2d 828 (Ind.Ct.App.1991).

In *Pfenninger*, the Court of Appeals held that an obligation to provide spousal maintenance, even one originating in a settlement agreement, was subject to judicial modification. 463 N.E.2d at 1121. Moreover, although the agreement in *Pfenninger* was silent regarding modification, the court's reasoning would allow judicial modification even if the agreement expressly prohibited all modification. *Id.*[4]

Conversely, in *Bowman*, the Court of Appeals held that a maintenance obligation that originated in a settlement agreement could be immunized from judicial modification by an express provision in the settlement agreement prohibiting modification. 567 N.E.2d at 830. The *Bowman* court challenged the very underpinnings of *Pfenninger*, and its reasoning could logically extend to preclude judicial modification of any maintenance obligation that arose under a settlement agreement. *Id.* Without going that far, the court held that the specific "non-modifiable agreement" was binding. It affirmed the trial court's dismissal of the petition to modify.

Throughout this litigation, Sharon has argued that paragraph 20 expressly foreclosed judicial modification of the maintenance obligation. Relying on *Bowman*, she has contended that courts should respect this non-modification provision and dismiss Ronald's petition.

Ronald has countered with two interrelated arguments. First, he has asserted that *Bowman* is inconsistent with *Pfenninger* and should not be followed. Further, he has contended that paragraph 20 merely regulates the form that *consensual* amendments to the agreement should take but that it does not preclude, or even speak to, judicial modifications. He has pointed out that the agreement in *Bowman* provided that its maintenance obligation "shall not in any way be

---

2. The record does not disclose Ronald's occupation, his level of income, or the nature or extent of the alleged change in his financial condition. The terms of the settlement agreement indicate that Sharon was a Ph.D. candidate at the time of the dissolution and that Ronald was probably the "financially superior spouse," *Bartrom v. Adjustment Bureau, Inc.*, 618 N.E.2d 1, 8 (Ind.1993).

3. In addition, Sharon again petitioned to have Ronald held in contempt for his continued refus-

al to pay the maintenance, but the judge ultimately denied her request.

4. Ronald has also cited *Baker v. Baker*, 552 N.E.2d 525, 527–28 (Ind.Ct.App.1990), and *DeVoe v. DeVoe*, 531 N.E.2d 1200, 1202 (Ind.Ct. App.1988), but these decisions merely cited *Pfenninger* and provided no additional reasoning to support resolution of the question.

modified," R. at 829 (internal quotation marks omitted). He has maintained that paragraph 20 is so ambiguous that applying *Bowman* to the present facts would so extend that precedent that *Pfenninger* would essentially collapse.

Judge Melichar rejected Ronald's arguments and dismissed his petition to modify the maintenance provision. He found the agreement "unambiguous" and apparently concluded that paragraph 20 foreclosed any judicial modification of maintenance obligation without the consent of both parties.

Ronald appealed. The Court of Appeals found paragraph 20 to be ambiguous and reversed. *Voigt v. Voigt,* 645 N.E.2d 627 (Ind.Ct.App.1994).

## II. Provisions For Maintenance

Sharon argues that paragraph 20 unambiguously precludes modification of the settlement agreement unless she and Ronald formally execute an amendment to it. She asks us to follow *Bowman* and hold that where a maintenance agreement expressly precludes judicial modification, courts have no authority to order a modification. Ronald, on the other hand, continues to argue that paragraph 20 is ambiguous and that applying *Bowman* would effectively overrule *Pfenninger* and its progeny.

We agree with the Court of Appeals that paragraph 20 probably is not clear enough to support the conclusion Sharon asks us to draw from it. It provides that a modification "shall be effective only if made in writing and executed with the same formality as this Agreement." (R. 37.) This language obviously could be read to preclude any modifications not formally executed by the parties themselves. However, Ronald's reading—that the paragraph regulates only the form of any consensual modification that the parties might choose to undertake—is not an unreasonable interpretation of this language. The provision is certainly not as clear as the

language in *Bowman.* *See* 567 N.E.2d at 829 (" '[T]his obligation shall not in any way be modified.' ").

Nevertheless, Ronald's insightful counsel has correctly identified an underlying tension between *Pfenninger* and *Bowman.* *See also Roberts v. Roberts,* 644 N.E.2d 173 (Ind.Ct. App.1994) (taking "a new look" at *Pfenninger* in light of *Bowman* but deciding to adhere to *Pfenninger* ). In holding that a court could modify a maintenance obligation originating in a settlement agreement, the *Pfenninger* court relied largely on our decision in *Meehan v. Meehan,* 425 N.E.2d 157 (Ind.1981).[5] There, we held that a court could modify a child support order even if its terms originated in a settlement agreement that purported to be " 'full, complete and absolute' " and " 'forever ... [to] determine the rights between [the] parties.' " *Id.* at 158.

In *Bowman,* the Court of Appeals persuasively rejected the analogy between spousal maintenance and child support upon which *Pfenninger* depended:

> The *Meehan* decision involving a child support order and the present case involving a spousal support order are governed by entirely different principles of public policy.... [T]he parent having custody of a child is merely the trustee of the child support payments and has no right to contract away the benefits of the trust in favor of that child....
>
> An entirely different principle of public policy is at work in the present case, namely, the freedom to contract.

567 N.E.2d at 830–31 (citations omitted). Put simply, the parties to a maintenance agreement are both grown-ups, free to bargain with their own legal rights. The *Bowman* court also correctly observed that courts had no express statutory authority to modify approved maintenance agreements.

---

**5.** In addition to *Meehan,* the court also cited a statutory provision that did not apply, *see* 463 N.E.2d at 1120 (citing Ind.Code Ann. § 31–1–11.5–9(c) (West 1979) (amended 1984) (providing for judicial modification of court-imposed maintenance)), two Court of Appeals precedents that were not on point, *see id.* (relying on *Farthing v. Farthing,* 178 Ind.App. 336, 382 N.E.2d 941

(1978) (permitting judicial modification of court-imposed maintenance); *Wilhelm v. Wilhelm,* 397 N.E.2d 1079 (Ind.Ct.App.1979) (holding court-imposed maintenance not authorized by statute)), and a passage from a generic legal encyclopedia, *id.* 1120–21 (citing 24 Am.Jur.2d *Divorce and Separation* § 846 (1983)).

*Id.* at 830; *see also Roberts,* 644 N.E.2d at 176.

In the present case, the Court of Appeals made a laudable effort at harmonizing *Pfenninger* and *Bowman.* It held that *Pfenninger* represented a general rule that maintenance awards originating in settlement agreements are subject to judicial modification. It then read *Bowman* as establishing a kind of *clear statement* exception, barring judicial modification where a maintenance agreement "unambiguously states that it cannot be modified." *Voigt,* 645 N.E.2d at 630.

This textbook example of common law reasoning resolves the conflict. On the other hand, it fails to address the underlying inconsistency between the rationales of *Pfenninger* and *Bowman.* We share Judge Sharpnack's inclination to take "a new look" at *Pfenninger, see Roberts,* 644 N.E.2d at 176.[6]

We shall consider whether a court may modify an approved maintenance agreement without the consent of both parties. Only if we find that courts possess that power must we decide whether paragraph 20 satisfies the requirements of any exception to that general power.

6. This Court has never squarely addressed the issue decided in *Pfenninger:* whether a court may modify maintenance provisions arising under an approved settlement agreement. On at least two occasions, we have acquiesced to the *Pfenninger* principle.

First, in *Myers v. Myers,* 560 N.E.2d 39 (Ind. 1990), an ex-spouse appealed the trial court's decision not to modify the maintenance provisions of an approved settlement agreement because the recipient spouse's unmarried cohabitation with a new significant other did not constitute a "changed circumstance[] so substantial and continuing as to make the terms" of a maintenance agreement "unreasonable." Ind.Code Ann. § 31–1–11.5–17(a) (West Supp. 1995). The authority of a court to modify a maintenance agreement, assumed in the decision, was not a contested issue, for the respondent spouse had filed her own cross-petition for modification of the maintenance provisions. 560 N.E.2d at 41–42. In a rare procedure, Justice Pivarnik simply adopted the Court of Appeals opinion affirming the trial court and incorporated the relevant passage of the unpublished appellate opinion into the body of his opinion for this Court. *See id.* at 42–43. In the quoted passage, the Court of Appeals had relied on *Pfenninger,* without analysis, for

### III. Modification of Maintenance Agreements

In determining the authority of the court to modify maintenance obligations arising under an approved settlement agreement, we begin by examining the distinction between court-imposed maintenance and maintenance agreements.

### A. Court–Imposed Maintenance

Before the adoption of the Dissolution Act, Pub.L. No. 297, 1973 Ind. Acts 1585, Indiana courts were expressly authorized to award "alimony" in divorce decrees, if the award would be "just and proper." Ind.Code § 31–1–12–14 (1971); Burns Ind. Stat. § 3–1217 (1933); 2 Ind.Rev.Stat. pt. 2, ch. 4, § 19, at 237 (1852). The purpose of such an award was to settle property rights, not to provide for spousal support. *Shula v. Shula,* 235 Ind. 210, 132 N.E.2d 612 (1956); *see also Dissette v. Dissette,* 208 Ind. 567, 196 N.E. 684 (1935)(indicating alimony is related to wife's elective share of husband's estate upon his death); *Musselman v. Musselman,* 44 Ind. 106 (1873)(indicating alimony award is given in lieu of dividing husband's real and personal property).[7] The 1973 act retained the option of settling property rights with

the proposition that a " 'maintenance settlor's right to later seek modification of maintenance is not foreclosed.' " *Id.* at 42 (quoting *Myers v. Myers,* No. 79A04-8804-CV-111, 536 N.E.2d 570 (Ind.Ct.App. March 16, 1989)). Needless to say, we did not squarely address that issue in *Myers.*

Second, in *Thomas v. Thomas,* 577 N.E.2d 216 (Ind.1991), we remarked in passing that maintenance provisions in approved settlement agreements were modifiable. *Id.* at 219. Nevertheless, the statement was extraneous, for the case involved an action to *clarify,* not modify, the terms of an approved settlement agreement. *Id.*

7. *But see McDaniel v. McDaniel,* 245 Ind. 551, 201 N.E.2d 215 (1964) (plurality opinion) ("[I]t is the basic concept of alimony that payments be made in lieu of a wife's right to the continued support of her husband."); Martin A. Rosen, Note, *Indiana's Alimony Confusion,* 45 Ind. L.J. 594, 601–03 (1970) ("It is unclear ... whether alimony in Indiana serves as a means of support for the divorced spouse, or only as a division of property."); Note, *Alimony in Indiana: Traditional Concepts v. Benefit to Society,* 29 Ind. L.J. 461, 469 (1954) (noting that some early cases considered husband's prospective earning capacity to be "property" out of which alimony award could be made).

lump sum or installment payments. Ind. Code Ann. § 31–1–11.5–11(b)(2) (West Supp. 1995) (retaining "just and proper" standard).

In the Dissolution Act of 1973, Indiana edged away from the strict policy against spousal support. For the first time courts were expressly authorized to award maintenance.[8] Nevertheless, the authorization was quite narrow.

The Civil Code Study Commission, which in 1970 drafted a proposed Dissolution of Marriage Act, recommended a modest but significant provision for spousal maintenance:

> SEC. 210. *Maintenance.* (a) ... [T]he court may grant a ... maintenance order[ ] for either spouse only if it finds
> (1) that the spouse seeking maintenance lacks sufficient income and property to provide for his reasonable financial needs and
> (2) that the spouse seeking support is unable to support himself through employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.
> (b) The maintenance order shall be in such amount and for such periods of time as the court may deem just. . . .

Report of the Indiana Civil Code Study Commission: Proposed Dissolution of Marriage Act § 210 (1970) [hereinafter Proposed Dissolution Act]. The proposed section also enumerated six factors for a court to consider when setting the amount and conditions of maintenance once it had determined that a spouse met the two statutory prerequisites. *Id.* The proposed section was taken almost verbatim from the corresponding section of a proposed uniform act. *See* Uniform Marriage and Divorce Act § 308 (1970).

In the General Assembly, the maintenance proposal met with strong resistance. The House of Representatives removed all references to maintenance. Stephen R. Pennell, Note, *Alimony in Indiana Under No–Fault Divorce,* 50 Ind. L.J. 541, 547 (1975). As finally enacted, the Dissolution Act contained only an extremely narrow provision for incapacity maintenance in § 9(c):

> The court may make no provision for maintenance except that when the court finds a spouse to be physically or mentally incapacitated to the extent that the ability of such incapacitated spouse to support himself or herself is materially affected, the court may make provision for the maintenance of said spouse during any such incapacity, subject to further order of the court.

Dissolution Act, § 1, 1973 Ind. Acts at 1590 (codified at Ind.Code Ann. § 31–1–11.5–9(c) (West 1979) (amended 1981, 1984, 1985)).

In 1984, the General Assembly revised the maintenance provision and slightly expanded the grounds upon which courts could order maintenance. P.L. 150–1984, §§ 1–2, 1984 Ind. Acts 1290, 1290–92. Section 9(c) now provides that "[t]he court may order maintenance in final decrees ... after making the findings required under section 11(e)." Ind. Code Ann. § 31–1–11.5–9(c) (West Supp. 1995). The original provisions for incapacity maintenance were transferred to § 11(e) and two additional grounds for maintenance were added. *See* Ind.Code Ann. § 31–1–11.5–11(e) (West Supp.1995).

Thus, while the General Assembly began moving away from the previously strict policy against court-imposed spousal maintenance in 1973, it has not authorized as broad a grant of power to courts as the Study Commission proposed in 1970.

In ordering maintenance today, an Indiana court is restricted to three, quite limited options. First, it may grant incapacity maintenance if it "finds a spouse to be physically or mentally incapacitated to the extent that the ability of the incapacitated spouse to support himself is materially affected." Ind. Code Ann. § 31–1–11.5–11(e)(1). Second, a court may order caregiver maintenance if it finds that a spouse must forego employment in order to care for a child with a physical or mental incapacity. *Id.* § 31–1–11.5–11(e)(2).

---

**8.** *But see* Ind.Code § 31–1–12–3 (1971) (repealed 1973) (authorizing maintenance for spouses adjudged incurably insane) and § 31–1–22–2 (1971) (repealed 1973) (authorizing award of temporary maintenance in separation decrees).

Third, a court may order rehabilitative maintenance for no more than three years if it finds that a spouse needs support while acquiring sufficient education or training to get an appropriate job. *Id.* § 31–1–11.5–11(e)(3).

■ Where none of these circumstances exist, a court may not order maintenance without the agreement of the parties. *In re Marriage of McManama*, 272 Ind. 483, 399 N.E.2d 371 (1980); *In re Marriage of Coomer*, 622 N.E.2d 1315 (Ind.Ct.App.1993). This policy reflects a clear legislative intent to retain fairly strict limits on the power of courts to order maintenance without the consent of the parties. *See Liszkai v. Liszkai*, 168 Ind.App. 532, 343 N.E.2d 799, (1976).

### B. Maintenance Agreements

The parties may themselves provide for maintenance in settlement agreements where the court could not otherwise order it. Under § 10(a) of the Dissolution Act "the parties may agree in writing to provisions for the maintenance of either of them, the disposition of any property owned by either or both of them[,] and the custody and support of children." Ind.Code Ann. § 31–1–11.5–10(a) (West 1979). The express purpose of this provision is to "promote the amicable settlements" of dissolution-related disputes, *id.*, and Indiana law has long favored these agreements.

■ While a court itself may award maintenance only under the narrow circumstances outlined in § 11(e), the parties are not so limited in drafting settlement agreements. The parties are free "to make such continuing financial arrangements as, in a spirit of amicability and conciliation, they wish." *Hull v. Hull*, 436 N.E.2d 841, 843 (Ind.Ct. App.1982); *accord Bowman*, 567 N.E.2d at 830; *Baker v. Baker*, 552 N.E.2d 525, 527 (Ind.Ct.App.1990); *Pfenninger*, 463 N.E.2d at 1119. This flexibility serves at least two purposes: (1) it enables a couple to dissolve their marital relationship on mutually acceptable terms without resort to judicial imposi-

tions, and (2) it provides the only effective mechanism by which divorcing couples can structure their financial relations so as to take advantage of the Internal Revenue Code's special treatment of maintenance payments. *Hicks v. Fielman*, 421 N.E.2d 716, 721 (Ind.Ct.App.1981).

Section 8(d) of the Dissolution Act authorizes parties to waive a final hearing and file a settlement agreement with the court. Ind. Code Ann. § 31–1–11.5–8(d) (West Supp. 1995). If the parties comply with § 8(d), the statute directs the court to enter a dissolution decree, Ind.Code Ann. § 31–1–11.5–9(a)(2) (West Supp.1995), which must incorporate the settlement agreement and include an order requiring the parties to carry out its terms, Ind.Code Ann. § 31–1–11.5–10(b) (West 1979).

A court is not, however, bound to accept every proffered settlement agreement. Section 10(b) empowers a court to "approve[ ]"—and consequently to disapprove—the terms of any settlement agreement. Ind.Code Ann. § 31–1–11.5–10(b). Both the Uniform Act and the Study Commission's proposed act recommended making settlement agreements binding on courts unless the agreements were unconscionable. *See* Uniform Marriage and Divorce Act § 306(b); Proposed Dissolution Act § 208(b). The legislature rejected that strict approach but substituted no express standard of review.

■ Nevertheless, we think the power to disapprove a settlement agreement must be exercised with great restraint. A trial judge should not reject a settlement agreement just because she believes she could draft a better one. *Stockton v. Stockton*, 435 N.E.2d 586 (Ind.Ct.App.1982) (involving property division). Restraint is especially justified where a settlement agreement contains provisions for maintenance, for the legislature has narrowly circumscribed the power of courts to impose maintenance on unwilling parties.[9] The mere submission by

9. The 1973 act is slightly disjointed in this respect. Because it more sharply limits the court's power to impose maintenance obligations than does the Uniform Act, it creates a larger category of cases in which the court cannot of its own

accord order maintenance. At the same time, however, it grants the court greater leeway in evaluating and rejecting proffered settlement agreements than does the Uniform Act. Thus, the 1973 act creates a sizeable class of cases in

the parties of a settlement agreement containing a maintenance provision should not effectively grant to the court—under the guise of modifying a proffered agreement—a general power to set whatever amount of maintenance the court may deem just and proper. In reviewing a settlement agreement, a court should concern itself only with fraud, duress, and other imperfections of consent, *Stockton*, 435 N.E.2d at 590, or with manifest inequities, particularly those deriving from great disparities in bargaining power. In the absence of problems such as these, it seems likely that agreements between the parties will produce the "just and reasonable" outcome contemplated by the Code. Ind.Code Ann. § 31–1–11.5–11(b) (West 1979).

In the usual case, freedom of contract will, it is hoped, produce mutually acceptable accords, to which parties will voluntarily adhere.[10] Moreover, the actual purpose lying behind any particular provision of a settlement agreement may remain forever hidden from the trial judge. Indeed, it may be quite idiosyncratic. While it is no doubt true that the purpose of court-imposed maintenance is "to continue the support of a spouse past the dissolution of the marriage," *Hicks*, 421 N.E.2d at 720, we cannot agree that simple support is always the sole reason for the existence of a maintenance provision in a settlement agreement. *Contra Roberts*, 644 N.E.2d at 177. In the present case, for instance, the settlement agreement twice referred to all the "promises and mutual covenants" of the agreement as "consideration." We can readily imagine that a court's bearing

down on a maintenance provision could produce a rupture in the delicate consent holding together another part of the agreement.[11]

For these reasons, we think it best that courts tread lightly when evaluating settlement agreements.

### C. Subsequent Modification

With this understanding of the distinction between court-imposed maintenance and maintenance agreements, we may proceed to the issue at hand. May a court subsequently modify a maintenance agreement upon the petition of one party and over the opposition of the other? In most cases the answer is no.

Where the issue involves the property disposition contained in an approved settlement agreement, the Dissolution Act is unambiguous: "The disposition of property settled by such an agreement and incorporated and merged into the decree shall not be subject to subsequent modification by the court except as the agreement itself may prescribe or the parties may subsequently consent." Ind. Code Ann. § 31–1–11.5–10(c) (West 1979). The answer is also clear where the issue involves maintenance that the court has ordered under § 9(c), as further regulated by § 11(e):

> Provisions of ... an order for maintenance ordered under section 9(c) of this chapter may be modified or revoked. Such modification shall be made only ... upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable....

which the court could not itself order maintenance but has discretion to review maintenance provisions that parties have proposed in settlement agreements.

10. Of course, for the reasons previously stated, the same principles and standards cannot apply to child custody and support provisions of proffered settlement agreements. *See Meehan*, 425 N.E.2d 157; *Bowman*, 567 N.E.2d at 830–31. If there is one overriding policy concern in dissolution actions, it is protecting the welfare and interests of children.

11. For instance, one spouse might agree to relinquish his or her claim to particular marital property in exchange for a promise of spousal maintenance. Such an arrangement does not

necessarily convert the maintenance payments into a property disposition. In exchange for giving up a claim to marital property, a spouse might demand maintenance far in excess of his or her fair share, or even the total value, of the property, anticipating, for example, the future value or revenue-generating potential of the property. While a court might not be able to mandate such a result, freedom of contract ensures that the parties may. In short, the disparate provisions of a settlement agreement may often reflect the outcome of an intricate bargaining process, or even a tenuous armistice between the parties. Readily available modification would make it difficult for people to reach agreements; every subsequent demand for change could provoke a reexamination of a multitude of issues.

Ind.Code Ann. § 17(a) (West Supp.1995). As the Court of Appeals has pointed out, this provision refers to the modification of only *court-imposed* maintenance, not of approved maintenance agreements. *Roberts,* 644 N.E.2d at 175; *Bowman,* 567 N.E.2d at 830. Nevertheless, Ronald argues that this section should be so extended.

His argument is not unprecedented. As originally enacted § 17(a) of the Dissolution Chapter did not authorize the modification of court-imposed maintenance obligations. *See* Dissolution Act, sec. 1, 1973 Ind. Acts at 1594.[12] Nevertheless, the Dissolution Act authorized courts to award incapacity maintenance—the only type then permissible— "subject to further order of the court." Ind. Code Ann. § 31–1–11.5–9(c)(West 1979) (amended 1984). Thus, the Court of Appeals decided to apply the "changed circumstances" standard of § 17(a). *See Farthing,* 178 Ind.App. at 341, 382 N.E.2d at 945 (1978).

Moreover, in a majority of states, maintenance obligations arising under settlement agreements may be subsequently modified by a court. In these states, the maintenance obligations "may be increased or reduced upon the same terms as any other [maintenance] decree." Homer H. Clark, Jr., The Law of Domestic Relations in the United States § 19.13, at 462 (2d ed.1987); *see also* John J. Michalik, Annotation, *Divorce: Power of Court to Modify Decree for Alimony or Support of Spouse Which Was Based on Agreement of Parties,* 61 A.L.R.3d 520 (1975).

On the other hand, both the Uniform Act and the Study Commission's proposed act prohibited modification of maintenance obligations if the settlement agreement contained a non-modification clause and, in the absence of such a clause, permitted modification only if changed circumstances rendered them "unconscionable." Uniform Marriage and Divorce Act § 316(a); Proposed Dissolution Act § 217(a). This strict standard was designed to discourage former spouses from using the modification process "repeatedly for vexatious purposes only." Proposed Dis-

solution Act § 217 comment (a); *accord* Uniform Marriage and Divorce Act § 316 comment ("This strict standard is intended to discourage repeated or insubstantial motions for modification.").

In addition to this legitimate concern for vexatious litigation, we believe modification of maintenance agreements approaches the limits of a court's statutory authority. As we have explained, the legislature intended to place severe restrictions on the power of courts to impose maintenance obligations. We have also noted that courts should exercise their authority to review settlement agreements with great restraint. Finally, it is obvious that a disgruntled former spouse should not be permitted to use the modification process to wage a collateral attack on a maintenance obligation. *Farthing,* 178 Ind. App. at 341–43, 382 N.E.2d at 945–46.

A few cases in somewhat analogous situations have found that courts lacked authority to modify maintenance awards. In *Luques v. Luques,* 127 Me. 356, 143 A. 263 (1928) (per curiam), the court reasoned that because "a husband cannot be compelled without his consent to provide ... support for a wife against whom he has obtained a divorce for her fault," the court could not modify "a decree for her future support *based on his consent* " unless he consented to the subsequent modification. *Id.,* 143 A. at 265 (emphasis added).

Applying a former statute, New York's Appellate Division reached a similar result. In denying a wife's petition to increase her maintenance, the court reasoned that "where the husband is entitled to a divorce based on the wife's misconduct, she has no right to support.... While the husband's agreement waived the alimony-bar provision of [the statute], it did so only to the extent agreed· upon...." *Greenberg v. Greenberg,* 175 A.D.2d 18, 571 N.Y.S.2d 731, 732 (1991); *accord Lamberti v. Lamberti,* 158 A.D.2d 449, 551 N.Y.S.2d 46, 47 (1990).

We think these cases, though not directly on point, establish a general principle applicable in the present case. Where a court

---

**12.** The reference to court-imposed maintenance was added in 1984. *See* Act of March 2, 1984, 1984, Pub L. No. 150–1984, sec. 4, 1984 Ind. Acts 1290, 1294.

had no authority to impose the kind of maintenance award that the parties forged in a settlement agreement, the court cannot subsequently modify the maintenance obligation without the consent of the parties. In essence, the parties must agree to amend their settlement agreement, because the sole authority for the maintenance obligation originally derived from their mutual assent.[13] In approving or rejecting any submitted modification agreement, a court should apply the same standard it would use in evaluating an initial settlement agreement.

■ We now hold that a court has no statutory authority to grant a contested petition to modify a maintenance obligation that arises under a previously approved settlement agreement if the court *alone* could not initially have imposed an identical obligation had the parties never voluntarily agreed to it. We therefore disapprove *Pfenninger.*

## IV. Conclusion

Because we conclude that the trial court is not authorized to modify the maintenance provision of the Voigt settlement agreement,[14] we need not decide whether paragraph 20 precludes such modification. Ronald's petition for modification was properly dismissed. Therefore, we affirm the judgment of the trial court.

DeBRULER, DICKSON and SELBY, JJ., concur.

SULLIVAN, J., concurs with separate opinion.

### ON PETITION TO TRANSFER

SULLIVAN, Justice, concurring.

I congratulate Chief Justice Shepard on an excellent and very helpful opinion. I write only to associate myself with the point made in footnote 13 of the opinion. I would be inclined to say that a court has the authority

to modify a maintenance obligation that originated in a settlement agreement but that rested on a ground—incapacity, caregiving, or rehabilitation—on which the court could have ordered the same maintenance in the absence of such an agreement. However, I agree that that issue is not before us and any decision on it should be reserved, especially because the freedom of contract considerations identified in footnote 11 and accompanying text will be present in such cases and point against modification.

---

**13.** We reserve the question whether a court may modify a maintenance obligation that originated in a settlement agreement but that rested on a ground—incapacity, caregiving, or rehabilitation—on which the court could have ordered the same maintenance in the absence of agreement. Cf., e.g., *Baker v. Baker*, 552 N.E.2d 525 (Ind.Ct. App.1990) (involving obligation which, although arising under settlement agreement, former

spouse claimed was intended to serve as incapacity maintenance).

**14.** Nothing in the record indicates that Ronald could in any way argue that the maintenance provision, as drafted, was designed to serve as incapacity, caregiver, or rehabilitative maintenance which the court could have ordered on its own accord.