

FILED

Oct 07 2015, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Anthony L. Kraus
Michael M. Yoder
Patrick L. Jessup
Yoder & Kraus, P.C.
Kendallville, Indiana

ATTORNEYS FOR APPELLEE

Lindsey A. Grossnickle
Matthew R. Shipman
Bloom Gates & Whiteleather, LLP
Columbia City, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Steven M. Kelly, <br> *Appellant-Respondent,* <br><br> v. <br><br> Rebecca J. Kelly, <br> *Appellee-Petitioner,* | October 7, 2015 <br><br> Court of Appeals Case No. 57A03-1502-DR-45 <br><br> Appeal from the Noble Superior Court <br><br> The Honorable Douglas Fahl, Special Judge <br><br> Trial Court Cause No. 57D01-9401-DR-7 |

**Bradford, Judge.**

## Case Summary

[1] Appellant-Respondent Steven M. Kelly ("Husband") and Appellee-Petitioner Rebecca J. Kelly ("Wife") (collectively "the parties") were divorced in 1995. The parties entered into a property settlement agreement which was accepted

by the trial court and provided that Husband would pay Wife five million dollars over the course of several years. In 1997, the parties, by written agreement, amended the original settlement agreement and established a new payment schedule under which Husband would pay Wife $300,000 each year until 2014 ("1997 PSA"). The parties entered into two subsequent agreements, in 1999 and 2003, under which Husband advanced or loaned money to Wife from the amounts she would be entitled to receive under the 1997 PSA. In 2007, Husband ceased making payments under the 1997 PSA payment schedule because he believed Wife had been advanced or loaned the maximum amount she would have been entitled to receive in the remaining eight years of the 1997 PSA.

[2] In 2013, Wife filed a motion requesting that the trial court enforce the terms of the 1997 PSA, alleging that Husband owed her the annual payments from 2007 to 2014 and that the agreements made following the 1997 PSA were unenforceable because they were not approved by the trial court. The trial court agreed with Wife, finding that it did not have jurisdiction to consider the 1999 and 2003 agreements because it had not approved and incorporated those agreements into the dissolution decree. The trial court ordered Husband to pay Wife $2.4 million. We find that the parties were free to modify the settlement agreement without approval of the trial court and that the trial court erred in failing to consider the 1999 and 2003 agreements. We reverse and remand.

# Facts and Procedural History

On November 3, 1995, the parties were divorced. The trial court incorporated into its dissolution decree a property settlement agreement ("Original PSA") entered into between the parties. The Original PSA provided that Wife was entitled to settlement payments totaling five million dollars to be paid in increments by Husband pursuant to the terms of the agreement. The Original PSA also provided that the agreement could only be amended by a "writing, signed by each of the parties and *approved by a court of competent jurisdiction*." App. p. 24 (emphasis added).

On November 26, 1997, the trial court approved an amended property settlement agreement submitted by the parties ("1997 PSA"). The 1997 PSA contained the following language:

> Section 2.3 Settlement Payments. The parties have had and may or may not continue to have financial transactions not precisely in compliance with the original agreement. These transactions have been cordial and in the spirit of mutual agreement and cooperation. To facilitate the continuing cooperation without the need for court intervention, the parties agree to a flexible payment schedule with only written unilateral agreement.
>
> * * *
>
> The new schedule of settlement payments is as follows:
> 12-31-97 $400,000.00
> 12-31-98  400,000.00
> 12-31-99  300,000.00
> 12-31-00  300,000.00
> 12-31-01  300,000.00
> 12-31-02  300,000.00
> 12-31-03  300,000.00
> 12-31-04  300,000.00

12-31-05  300,000.00
12-31-06  300,000.00
12-31-07  300,000.00
12-31-08  300,000.00
12-31-10  300,000.00
12-31-11  300,000.00
12-31-12  300,000.00
12-31-13  300,000.00
12-31-14  300,000.00
TOTAL PAYMENTS: $5,600,000.00

* * *

This schedule is flexible at the discretion of the parties with unilateral agreement....It is the intent of the parties to do so without the need of further court intervention.

Ex. C pp. 3-4.

[5]     On May 10, 1999, the parties entered into a Property Settlement Reconstruction ("1999 Agreement") which provides, in relevant part, as follows:

[Wife] seeks advance payments from the 1997 court amended and approved revised schedule. [Husband] agrees to advance $1,200,000.00. By way of cash value compensation, [Wife] agrees to pay a 12% a.p.r. off setting adjustment due 12-31 each succeeding year. In accordance with the court amendment, this modification only requires agreement between the parties.

Ex. D. The 1999 Agreement and all subsequent agreements between the parties were not submitted to the trial court for approval. Both parties testified that they viewed the agreements entered into subsequent to the 1997 PSA as ongoing modifications to the payment schedule outlined in the 1997 PSA.

In 2003, the parties entered into an agreement entitled the SMK-RJK Loan Agreement ("2003 Agreement") which provides, in its entirety, as follows:

> [Wife] may borrow up to $500,000.00 in $100,000.00 increments. Interest is payable at 12% simple calculated at the per diem rate and payable upon return of the funds. If the funds are returned at any year-end, interest may be deducted from property settlement payments. Funds may be repaid at anytime in identical $100,000.00 increments. Security is not necessary because of the pending property settlement due Rebecca. Failure to repay the balances due will result in collection from the property settlement at the end of that agreement.

Ex. E.

The parties do not dispute that Husband made all payments required under the 1997 PSA through 2006. According to Husband, at the conclusion of 2007, Wife owed Husband a total of $1,414,200. Husband ceased payments under the 1997 PSA on the basis that the amounts owed between the parties were even and offset.

On April 25, 2008, the parties entered into an agreement titled Property Settlement Addendum ("2008 Addendum"). The 2008 Addendum states that Wife has "exhausted her ability to borrow from the Property Settlement Agreement, actually exceeding by $22,634.93," that "[Wife] is desperate for $30,000," and that Husband agrees to loan Wife $30,000 with collateral comprising of an automobile and two John Deere Gators. Ex. F.

[9] On January 28, 2013, Wife petitioned for a rule to show cause, arguing that Husband should be required to pay the remaining balance due under the 1997 PSA without consideration of the subsequent agreements. On November 19, 2013, Wife filed a motion for proceedings supplemental and a motion to enforce the 1997 PSA. Wife argued that the following language from the 1997 PSA is ambiguous: "To facilitate the continuing cooperation without the need for court intervention, the parties agree to a flexible payment schedule with only written unilateral agreement." Ex. C p. 3. Wife argued that the phrase "unilateral agreement" was ambiguous and so the entire modification provision should be stricken from the agreement. Once stricken, the Original PSA would control the parties' ability to modify the settlement. Wife argued that because the Original PSA required court approval for modifications, the agreements following the 1997 PSA were not valid modifications to the settlement agreement.

[10] In its order on Wife's motions, the trial court issued its own findings of fact and conclusions of law.

FINDINGS OF FACT

**B. Motion for Proceeding Supplemental and Motion to Enforce Settlement Agreement**

1. The Original PSA allowed for settlement payments over time that accrued interest and allowed for yearly principal and interest payments to [Wife].

2. The [1997] PSA called for yearly property settlement payments as follows: $400,000 on December 31, 1997 and December 31,

1998; and payments of $300,000 on December 31st of every year from 1999 to 2014. These payments total $5.6 million dollars over the life of the [1997] PSA.

3. [Husband] failed to make the [1997] PSA's yearly payment of $300,000 due in 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014. [Husband's] failure to make the payments due under the [1997] PSA result in a debt owed to [Wife] in the amount of 2.4 million dollars.

4. [Husband] provided evidence that he made two separate loans to [Wife] which loans were represented by the "May 1999 Property Reconstruction" and the "$500,000 Additional Advance Agreement" (the "Loan Agreements"). The total loan amount according to these two loan agreements was $1,700,000.00.

5. The Court will consider the Loan Agreements as a defense to the issue of contempt in this matter.

6. The Court will find that the Court lacks jurisdiction to consider the Loan Agreements…because they were not approved by the Court and made part of the divorce decree. If [Husband] believes he is owed compensation under the Loan Agreements, the Court finds that he should proceed with said action in the appropriate venue.

* * *

**D. The Amended PSA is Patently Ambigious** [sic]

1. Section 2.3 of the [1997] PSA contains the following provision: "To facilitate the continuing cooperation without the need for court intervention, the parties agree to a flexible payment schedule with only written unilateral agreement." This provision contains a patent ambiguity, with respect to the term "unilateral agreement."

* * *

CONCLUSIONS OF LAW

**A. Motion for Proceeding Supplemental and Motion to Enforce Settlement Agreement**

…

9. In this case, [Husband] introduced the Loan Documents; however, these documents should not be considered by the Court because they were never approved and signed by the Court, and therefore, they are not legally binding on the parties….

**C. The [1997] PSA is Patently Ambigious** [sic]

1. A marital settlement agreement incorporated into a dissolution decree is treated as a contract and interpreted according to the rules of contract construction. *Rodriguez v. Rodriguez*, 818 N.E.2d 993, 995 (Ind. Ct. App. 2004) *trans. denied*.

…

6. A contract is ambiguous if reasonable people could come to different conclusions about its meaning. *Simon Prop. Grp., L.P. v. Michigan Sporting Goods Distributors, Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005) (citing *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002)).

7. A patent ambiguity "is apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning." [*Id.* at 1070-71]

…

9. Extrinsic evidence is not admissible to resolve a patent ambiguity. [*Id.*]

…

11. Section 2.3 of the [1997] PSA contains the following provision: "To facilitate the continuing cooperation without the need for court intervention, the parties agree to a flexible payment schedule with only written unilateral agreement." This provision contains a patent ambiguity, with respect to the term "unilateral agreement." As such, Section 2.3 should be stricken from the [1997] PSA as it is patently ambiguous.

12. Once Section 2.3 is removed from the [1997] PSA, there is no authorization for the payment terms of the [1997] PSA to be modified subsequent to the date of the [1997] PSA. As such, [Husband] failed to make payments due under the [1997] PSA without justification or authorization from this Court.

It is, therefore, ordered, adjudged, and decreed as follows:

1. The Loan Agreements between parties are held to be outside the jurisdiction of this Court as the Agreements were not approved by the Court pursuant to *Anderson v. Anderson*, 399 N.E.2d 391, 398 (Ind. App. Ct. 1979).

2. The Court further holds that the [1997] PSA is patently ambiguous with respect to section 2.3…. As such, and considering that contracts are construed against the drafter and that no extrinsic evidence is admissible to resolve a patent ambiguity, section 2.3 which allowed for payment arrangements without the court's approval, is stricken from the [1997] PSA because it is ambiguous.

App. p. 22-29.

# Discussion and Decision

On appeal, Husband claims that the trial court erred in failing to consider the 1999 and 2003 Agreements as valid modifications of the settlement agreement.

# Standard of Review

[12] Where, as here, the trial court entered findings of fact and conclusions thereon pursuant to Trial Rule 52(A), we apply a two-tiered standard of review. *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011), *trans. denied*.

> [F]irst, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Those appealing the trial court's judgment must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them de novo.

*Id.* (internal citations omitted).

# I. Patent v. Latent Ambiguity

[13] The allegedly ambiguous provision of the 1997 PSA reads

> The parties have had and may or may not continue to have financial transactions not precisely in compliance with the original agreement. These transactions have been cordial and in the spirit of mutual agreement and cooperation. To facilitate the continuing cooperation without the need for court intervention, the parties agree to a flexible payment schedule with only written *unilateral* agreement.

Ex. C. (emphasis added). We are not persuaded that this language is necessarily ambiguous and think it would be more aptly described as a misstatement.

[14] Clearly, "unilateral agreement" is nonsensical in this context, both legally and grammatically. However, the parties agree, and it seems clear from the context of the agreement and subsequent action by the parties, that the intent of the language was to allow the parties to amend the payment schedule without approval by the trial court, *i.e.* the parties wanted to be able to amend the 1997 PSA by *mutual* agreement. This is evidenced clearly by the 1999 Agreement which states, "In accordance with the [1997] court amendment, this modification only requires agreement between the parties." Ex. D. As such, there are no conflicting interpretations of the agreement, as is required to find ambiguity. See *Simon*, 837 N.E.2d at 1070 ("language is ambiguous only if reasonable people could come to different conclusions about its meaning"). Still, because the parties seem to agree that the provision is ambiguous, we will address that issue.

[15] Husband argues that the trial court erred in considering a distinction between patent and latent ambiguities because this legal standard has been abrogated. We note that Wife does not respond to this argument in her brief. Failure to respond to an issue raised in an opposing party's brief is akin to failing to file a brief, as to that issue. *Gwinn v. Harry J. Kloeppel & Assocs., Inc.*, 9 N.E.3d 687, 690 (Ind. Ct. App. 2014). Where one party fails to file an appellate brief, we may reverse the trial court if the appellant presents a case of prima facie error.

*Id*. "Prima facie means 'at first sight, on first appearance, or on the face of it.'" *Id*. (quoting *Ponziano Const. Servs. Inc. v. Quadri Enter., LLC*, 980 N.E.2d 867, 875 (Ind. Ct. App. 2012).

[16] In 2006, the Indiana Supreme Court abrogated the patent/latent ambiguity rule, holding that "the latent/patent distinction has not been consistently applied and no longer serves any useful purpose. Accordingly, we conclude that where an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving the ambiguity." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006). Accordingly, the trial court erred when it failed to consider extrinsic evidence in interpreting the allegedly ambiguous language in the 1997 PSA.

## II. Freedom to Amend Property Settlement Agreements

[17] Again, we find that the language in Section 2.3 of the 1997 PSA has only one rational meaning when considered in context of the entire document and based on the fact that the parties entered into several subsequent agreements without submission to the trial court for approval: to allow the parties to modify the payment schedule outlined in the 1997 PSA by mutual agreement without approval from the trial court. However, Wife claims that despite the parties' intent by this modification language, the parties were not free to modify the agreement without court approval pursuant to Indiana code sections 31-15-2-17 and 31-15-7-9.1.

[18]    Indiana Code section 31-15-2-17 provides that "[t]he disposition of property settled by [a dissolution agreement] and incorporated and merged into the decree is not subject to subsequent modification by the court, except as the agreement prescribes or the parties subsequently consent." Indiana Code section 31-15-7-9.1 provides that "[t]he orders concerning property disposition…may not be revoked or modified, except in case of fraud." Wife argues that these statutes require court approval for any modification of a settlement agreement to be effective and enforceable by the dissolution court, regardless of whether the agreement itself requires court approval. We disagree.

[19]    The Indiana Supreme Court addressed these statutes in *Johnson v. Johnson*, 920 N.E.2d 253 (Ind. 2010).

> [P]roperty distribution settlements approved as part of a dissolution *may be modified only where both parties consent or* where there is fraud, undue influence, or duress, none of which is alleged here. Ind. Code § 31-15-2-17(c) (*disposition of property settled by agreement may not be modified by court*); Ind. Code § 31-15-7-9.1 ("orders concerning property disposition … may not be revoked or modified, except in case of fraud."); [*Marriage of Snow v. England*, 862 N.E.2d 664, 668 (Ind. 2007)] ("As with other contracts*, a division of property may only be modified according to the terms of the agreement, if the parties' consent*, or if fraud or duress occurs."); *Myers v. Myers*, 560 N.E.2d 39, 42 (Ind. 1990) ("A property settlement agreement incorporated into a final dissolution decree and order may not be modified *unless the agreement so provides or the parties subsequently consent*.").

*Id*. at 258 (emphases added); *see also Bandini v. Bandini*, 935 N.E.2d 253, 263-64 (Ind. Ct. App. 2010) ("a final division of marital property may not be modified,

except as prescribed by the agreement itself or subsequent consent of the parties, or in the event of fraud").

[20] Section 31-15-2-17(c) prohibits a *court* from modifying a property settlement agreement unless permitted by the agreement. It does not limit the parties' freedom to contract and modify the agreement as they wish. Such a limitation would run counter to longstanding public policy that "the parties [in a dissolution] are free to make such continuing financial arrangements as, in a spirit of amicability and conciliation, they wish." *Voigt v. Voigt*, 670 N.E.2d 1271, 1277 (Ind. 1996) (citations omitted). It is clear that a property settlement agreement may be amended without approval of the dissolution court so long as the terms of the agreement do not require such approval.

[21] Furthermore, it is well within a dissolution court's discretion to interpret subsequent agreements between the parties regarding the original property settlement agreement even if the dissolution court was not required to and did not approve the amendments. *Shepherd v. Tackett*, 954 N.E.2d 477, 480 (Ind. Ct. App. 2011) ("A dissolution court retains jurisdiction to interpret the terms of its decree and decide questions emanating from its decree pertaining to its enforcement. Clarifying a settlement agreement, consistent with the parties' intent, is not the same as modifying the agreement.").

[22] With the foregoing in mind, we reverse and remand with instructions that the trial court consider the 1999 and 2003 Agreements, and amounts paid pursuant

to those agreements, in determining what sum, if any, Husband owes under the 1997 PSA.

## III. Whether the Trial Court Failed to Attach Interest to the Judgment Award

[23] Wife claims on cross-appeal that the trial court erred by failing to attach any interest payable on the $2.4 million judgment.[1] It appears that the 1997 PSA was designed to incorporate the interest which would have accrued under the Original PSA directly into the amended annual payments so as to avoid tax liability for Wife on the interest received. The 1997 PSA states, "A new [payment] schedule retroactively eliminates all previous and future references to interest…." Ex. C p. 3. However, the default provisions of the Original PSA called for the payment of interest in the event of Husband's default and the 1997 PSA specifically preserved the default provisions of the Original PSA. Therefore, it is unclear whether and how interest would accrue in the event of default. The trial court did not address this issue. Additionally, it is unclear whether Husband defaulted on any scheduled payments. Accordingly, we will reserve judgment on this issue as the trial court will be in a better position on remand to address the issue once it has determined whether Husband owes any remaining amounts under the parties' various agreements.

---

[1] We note that the trial court's monetary judgment will likely be reduced in whole or in part on remand pursuant to this decision. It is not clear whether the amounts owed between the parties offset evenly, therefore the issue of interest may or may not be relevant.

The judgment of the trial court is reversed and remand with instructions.

May, J., and Crone, J., concur.